ÆTNA INDEMNITY CO. v. J. R. CROWE COAL & MINING CO.

(Circuit Court of Appeals, Eighth Circuit. April 27, 1907.)

No. 2,354.

1. INSURANCE—EMPLOYER'S LIABILITY BOND—SIGNATURE OF SERVANT.

Where the execution by a servant of an employer's liability bond was not made a consideration for nor a condition of the creation of liability by the insurer, but the latter thereafter continued the bond, which was not signed by the servant, three times for a further new consideration, subject to the conditions and covenants of the bond, defendant was not entitled to object that it was not liable on the last renewal, because the bond was not originally signed by the servant as contemplated.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, § 1041. Guaranty insurance, see note to American Credit Indemnity Co. v. Wood, 19 C. C. A. 271.]

2. SAME—NOTICE.

An employer's liability bond provided that the insurer should indemnify the employer against fraudulent or dishonest acts of the employé amounting to embezzlement or larceny, subject to the condition that the insurer should be notified in writing of any fraudulent or dishonest act on the part of the employé which might involve a loss for which the company was responsible, immediately after the occurrence of such act should have come to the employer's knowledge. Held, that the notice required was one which would charge the employé with the commission of a felony, and hence the employer was not bound to give such notice until it had acquired knowledge sufficient to justify a reasonable man in making such a charge.

3. SAME—EVIDENCE.

In an action on an employer's liability bond, evidence held to sustain a finding that plaintiff gave immediate notice of the employé's default, after acquiring knowledge that such default amounted to the crime of embezzlement or larceny, against which the bond only granted indemnity.

4. SAME—RENEWAL—CONTRACT—REPRESENTATIONS.

An original employer's liability bond was issued in 1901, insuring plaintiff against the employé's misconduct for a year. It was renewed for a new consideration for the succeeding year, and again for the years 1903 and 1904; the renewal reciting that it was made in consideration of $20 premium, and continued the bond in force to June 1, 1904, "subject to all the covenants and conditions thereof." Held, that the renewal did not include a statement issued February 24, 1903, in which plaintiff represented that checks signed by the insured employé should be safeguarded by certain other signatures, so that a failure to perform such representation did not relieve defendant from liability on the bond.

5. SAME—CORRESPONDENCE—CONSTRUCTION.

Where there is doubt and uncertainty concerning the effect of correspondence on an employer's liability bond, such doubt should be resolved in favor of sustaining the contract as executed in favor of the insured.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, § 295.]

6. SAME—NATURE OF CONTRACT.

An employer's liability bond is essentially a contract of indemnity against loss, governed by the rules applicable to ordinary life and fire insurance policies.

7. SAME—APPLICATION FOR INSURANCE—ACCEPTANCE.

An application for insurance is a proposition to the insurance company which must be accepted as made, if at all.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 28, Insurance, §§ 196, 198.]

154 F.—35

**8. SAME—ACTION ON POLICY—TRIAL—INSTRUCTIONS—CONSTRUCTION.**

In an action on an employer's liability bond, the court charged that the employer's statement, made by plaintiff and pleaded by defendant as being the basis and part of the contract, was confessed by the pleadings and admitted to have been executed and delivered to plaintiff by defendant. *Held*, that such instruction should be construed to mean that plaintiff admitted only that the statement was executed and delivered for some purpose, and not that it was the basis of the contract.

**9. PLEADING—REPLY—FAILURE TO VERIFY—EFFECT.**

Rev. St. Mo. 1899, § 746 [Ann. St. 1906, p. 731], provides that, when any petition or other pleading shall be founded on any instrument of writing charged to have been executed by the other party, the execution of the instrument shall be adjudged confessed, unless the party charged to have executed the same denies its execution by verified answer or replication. *Held*, that where a verified answer pleaded that a written instrument had been made by plaintiff to defendant, and was the basis of an employer's liability bond sued on, plaintiff's failure to verify its replication of general denial only admitted the execution and delivery of such instrument, and was sufficient to join issue on the question whether the statement was the basis of the contract.

**10. WRIT OF ERROR—PRESUMPTIONS—VERDICT.**

Where the record on a writ of error does not clearly show that the jury's finding was contrary to the instructions of the court when taken as a whole, it will be presumed that the jury followed the instructions, and that the verdict is right.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, § 3757.]

**11. SAME—ASSIGNMENT OF ERRORS—INCORPORATION IN BRIEF.**

Under Circuit Court of Appeals rule 24 (150 Fed. li), declaring that the brief for the plaintiff in error shall contain a specification of the errors relied on, and shall set out separately and particularly each error asserted and intended to be urged, an objection that a false or misleading issue had been tried to the prejudice of plaintiff in error could not be reviewed, where no such error was so assigned.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, § 3094.]

**12. SAME—RIGHT TO. ALLEGE ERROR.**

Where the trial of an alleged false issue was induced by defendant's own procurement, over plaintiff's objection, defendant could not object thereto on a writ of error.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, §§ 3591, 3593.]

**13. SAME—PREJUDICE.**

Where a judgment was for the right party and in the interest of substantial justice, it will not be reversed on a writ of error because the court proceeded on an erroneous theory.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, § 4034.]

**14. SAME—SCOPE OF REVIEW—DAMAGES—EXCESSIVENESS.**

Where a verdict returned in the federal court has been allowed to stand by the trial judge, it cannot be set aside on appeal as excessive.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, § 3948.]

**15. SAME—INSTRUCTIONS.**

Where, in an action on a fidelity bond, the court gave an instruction with reference to the allowance of a credit in favor of defendant, whether the verdict contravened such instruction was reviewable on a writ of error.

**16. SAME—PREJUDICE.**

> Where, in an action on a fidelity bond, the verdict returned was in strict accord with the proof touching the amount of the employé's embezzlement, and under no theory was defendant entitled to a credit which the jury disallowed, defendant was not entitled to a reversal because the disallowance of such credit was contrary to an ambiguous instruction with reference thereto.
>
> [Ed. Note.—For cases in point, see Cent. Dig. vol. 3, Appeal and Error, § 4231.]
>
> Sanborn, Circuit Judge, dissenting.

In Error to the Circuit Court of the United States for the Western District of Missouri.

W. B. Homer (Botsford, Deatherage & Young, on the brief), for plaintiff in error.

W. F. Guthrie (Boyle, Guthrie & Smith, on the brief), for defendant in error.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

ADAMS, Circuit Judge. The mining company brought its action against the indemnity company to recover on a contract whereby the latter undertook to indemnify the former to the extent of $5,000 against loss which might be occasioned by embezzlement or larceny of its funds by David C. Graves, its bookkeeper and cashier, during the year beginning June 1, 1903, and ending June 1, 1904. The defendant agreed to indemnify against "fraudulent or dishonest acts" of Graves "amounting to embezzlement or larceny," subject, however, to a condition in the following words:

That it "shall be notified in writing, * * * of any fraudulent or dishonest act on the part of the employee, which may involve a loss for which the company is responsible hereunder, immediately after the occurrence of such act shall have come to the knowledge of the employer."

An embezzlement amounting to some $7,000 occurred while the contract was in force, and a preliminary notice of its possibility was given the defendant on May 28, 1904, and a final notice of its actual occurrence was given June 24, 1904. After refusal by defendant to reimburse the plaintiff to the extent of $5,000, this suit was instituted in the Circuit Court, and resulted in a judgment for $4,409.23; that being the amount of embezzlement found to have occurred during the year covered by the contract. On this writ of error taken by defendant the proceedings below are challenged (1) because the contract was not signed by Graves, (2) because immediate notice of loss was not given, (3) because of breach of warranties made in the statement upon the faith of which the contract was made, (4) because the verdict was excessive and contrary to the court's instructions, (5) because erroneous instructions were given to the jury.

Did the failure of Graves to sign the contract invalidate it?

It seems to have been originally prepared with the intention of having him sign it, but for some unexplained reason it was not done. While the contract is denominated a bond, it has few, if any, of the characteristics of a bond. It is essentially a contract of indemnity. Graves was mentioned in it, nor as principal, but as an independ-

ent party. No reference was made to him in the body of the instrument, except in one clause, which is to the effect that Graves will save the indemnity company harmless from any loss or damage it might sustain. Two separate and distinct contracts between different parties appear to have been contemplated; one between plaintiff and the indemnity company, consisting of a contract of indemnity, and the other between Graves and the indemnity company, consisting of a contract of guaranty. In the former, Graves was not concerned; in the latter, plaintiff was not concerned. The execution of the contract by Graves is, in terms, made neither a consideration for nor condition of the creation of liability by the indemnity company. The bare fact that these separable contracts were possibly originally intended to be incorporated in one writing does not render them any. the less separable and distinct in their nature and purpose.

Moreover, if there were any doubt on this subject, defendant subsequently adopted the instrument, as it was actually signed, as the contract between itself and plaintiff. The instrument sued on was a renewal of that contract. The latter was made June 14, 1901, and insured the plaintiff against the misconduct of Graves for the period of one year from June 1, 1901, to June 1, 1902. After the year had expired, an obligation for a new consideration paid by plaintiff was executed by defendant extending the insurance so as to cover the year ending June 1, 1903. A like extension followed covering the year ending June 1, 1904. During this latter period the embezzlement in question occurred. These different extensions were all based upon and recognized the original contract of June 14, 1901, known and numbered by the defendant as bond F. 1,774. The last renewal bore date June 30, 1903, and reads as follows:

"In consideration of the payment of the sum of $20.00, being the premium for the third year upon bond F. 1,774 of the Ætna Indemnity Company for $5,000, * * * said bond is hereby continued in force until June 1, 1904, subject to all the conditions and covenants thereof."

These renewals, executed for valuable consideration received and appropriated by defendant, clearly affirm the original contract notwithstanding the absence of Graves' signature and estop it from asserting its invalidity when repeatedly so affirmed by it.

Was immediate notice of loss, within the meaning of the contract, given to defendant? This question is presented on an exception taken to the action of the trial court in refusing to instruct the jury to return a verdict for defendant. Our consideration is therefore limited to an inquiry whether there was any substantial evidence before the jury tending to show that the required notice was given.

The contract of indemnity obligated defendant to reimburse plaintiff for the pecuniary loss it might sustain by reason of fraudulent or dishonest acts of Graves amounting to embezzlement or larceny. The notice required to be given was, in the language of the contract, "of any fraudulent or dishonest act of Graves involving a loss for which the company is responsible"; that is, a loss arising out of embezzlement or larceny by the employé. This notice was required to be given, not immediately after any fraudulent or dishonest act

amounting to embezzlement should be committed, but only "immediately after the occurrence of such act shall have come to the knowledge of the employer." From this analysis of the contract it appears that the notice required was one that would charge the employé with the commission of a felony, and was required to be given only after knowledge should have come to the employer of the commission of such offense.

In the case of Fidelity & Deposit Co. v. Courtney, 186 U. S. 342, 22 Sup. Ct. 833, 46 L. Ed. 1193, an indemnity contract much like the one now before us, requiring "immediate notice," of a default, was under consideration, and it was held that a notice given "with due diligence under the circumstances of the case, and without unnecessary or unreasonable delay," would answer the requirement of the contract; that "immediate notice" is given when it is reasonably immediate.

In American Surety Co. v. Pauly, 170 U. S. 133, 145, 18 Sup. Ct. 552, 557, 42 L. Ed. 977, the Supreme Court, in considering the knowledge required to move an employer to give a notice like that required in this case, approved an instruction given by the trial court in the following words:

> "And in considering this issue you are to inquire, first, when it was that the plaintiff became satisfied that the cashier had committed dishonest or fraudulent acts which might render the defendant liable under this policy. He may have had suspicions of irregularities. He may have had suspicions of fraud. But he was not bound to act until he had acquired knowledge of some specific fraudulent or dishonest act which might involve the defendant in liability for misconduct."

And in doing so observed as follows:

> "It may well be held that the surety company did not intend to require written notice of any action upon the part of the cashier that might involve loss, unless the bank had knowledge, not simply suspicion, of the existence of such facts as would justify a careful and prudent man in charging another with fraud or dishonesty. If the company intended that the bank should inform it of mere rumors or suspicions, * * * such intentions ought to have been clearly expressed in the bond."

These authorities place a reasonable and practical construction upon contracts of the kind in question, one under which the rights of both parties are fairly respected and protected. The serious effect of making a criminal charge upon the character, business, social standing, and future prospects of an employé, as well as a proper appreciation of the personal responsibility assumed in making a false charge by an employer, reasonably call for great circumspection and caution in making it. Immediate notice—that is, literally speaking, instantaneous notice—is not required to be given, but only such notice as reasonable diligence, under all the circumstances of the case, dictates after knowledge of facts requiring it is obtained. And this is not required to be given on mere rumor of irregularities or suspicion of dishonesty; neither is absolute or complete knowledge of an accomplished crime necessary before the employer is required to act, but only such knowledge of facts as would justify a careful and prudent man in believing a crime to have been committed.

We are accordingly brought to a consideration of the question whether there is any substantial evidence in the record tending to show that plaintiff gave "immediate notice," as just defined, after it had acquired "knowledge," as just defined, of any dishonest acts of its employé amounting to embezzlement or larceny.

A general consideration of the evidence will suffice to answer the question. Graves had been a trusted employé of plaintiff for five or six years; had during those years been advanced on his merits from the position of bookkeeper to that of secretary and cashier. He handled from $50,000 to $80,000 per month. Until the events next referred to occurred, no suspicion had befallen him. On April 22, 1904, plaintiff employed an expert bookkeeper for the purpose of revising and improving its system of bookkeeping. This expert immediately entered upon the discharge of his general task and soon discovered that there was a discrepancy of $212.47 between the cashbook and the cash in the cashier's possession. On the following day Graves was advised of this discrepancy, admitted its correctness, and gave some plausible explanation of it. The expert testified, in substance, that he was satisfied on April 23d that there was a shortage in Graves' accounts and irregularities in his bookkeeping, and that there was great room for improvement in the system. He gave out no specific information about the amount of delinquency because, as he says, he could not produce evidence, and was not prepared to make any absolute statement of the facts. He defines what he meant by the word "shortage" by saying:

"I just mean this: That according to his own figures as he had them, and as his books according to his system showed, he had a discrepancy of $212.47."

The above are the substantial facts concerning the discovery made on April 23d, the date from which defendant claims immediate notice should be calculated; but the expert was permitted to draw deductions, not only from the facts, but from the appearance of Graves at the time. He testified that Graves seemed to be in trouble. That:

"If a man is laboring under a great strain, and feels that he is about to be discovered in criminal acts, he will certainly show some evidence of fear, and will show concern, and this is what Mr. Graves showed—very considerable concern."

He further testified that Graves appeared to droop and complained of feeling sick. It was from such nebulous and unsubstantial data as this that the expert was made on cross-examination to draw the deduction that he believed as early as April 23d that there was a defalcation; and it is on this general kind of evidence we are asked to hold that plaintiff had such knowledge of the commission of the crime of embezzlement by Graves as required it "immediately" after April 23d to give the preliminary notice to defendant.

This evidence seems to us to amount to nothing more than ground for a suspicion or general distrust, and certainly does not necessarily warrant the conclusion under the authorities already cited that plaintiff, whose officers co-operated with the expert, then had that kind of knowledge of the commission of the crime of embezzlement as would justify it in making a charge of that kind and require it im-

mediately thereafter to give the preliminary notice. All the evidence concerning the discovery made by the expert on the first day of his service is subject to inferences of different kinds, and we cannot say that they were consistent alone with the guilt of Graves. Many a bookkeeper, without doubt, has made mistakes, been short in his cash, confused in his accounts, and shown anxiety and distress over them, without having committed the crime of embezzlement. It is certain, we think, that all reasonable men, in the exercise of an honest and impartial judgment, would not have concluded from the facts as disclosed by this record, with all the reasonable inferences deducible from them, that plaintiff knew on April 23d that Graves had committed the crime of embezzlement or larceny, and therefore we cannot hold that for want of notice of loss to defendant immediately thereafter recovery is precluded.

On April 23d the expert commenced and prosecuted a thorough investigation into Graves' accounts. The latter had adopted ingenious devices for covering his defalcations. More money had been charged to expenses than ought to have been, less money had been credited to customers and deposited in the bank than ought to have been, and the books of the plaintiff had been doctored in one way or another to meet the necessities of the situation. The handling of $50,000 to $80,000 per month by Graves afforded temptation and opportunity alike. The expert was required to disentangle these accounts, and in so doing to investigate the actual transactions, between defendant and divers persons, out of which the accounts sprung. He, in connection with plaintiff's officers, devoted himself assiduously to this task until May 28th, when plaintiff first notified defendant that an examination of the accounts was being made, and that "there appeared to be every evidence that there would be a shortage," which it would call upon defendant to pay under its renewal bond F. 1,774. The examination proceeded until June 24, 1904, when, the expert testified, he was first certain he had arrived at the truth. On that date plaintiff wrote defendant as follows:

"With further reference to my letter of May 28th and our conversation of June 8th, in regard to probable shortage of D. C. Graves, our former bookkeeper and cashier, the accountant who has been checking our books has made report to-day, and the total deficit is $7,121.25. We will claim protection under bond F. 1,774, which was issued June 1, 1901, and renewed, your No. 3,571, dated June 30, 1903. If representative of your company wants to verify our investigation, we have everything in shape so that he can do so."

Thereafter, defendant wrote plaintiff as follows:

"We beg to acknowledge receipt of your favors of the 24th inst. and of the 28th ult. addressed to Mr. T. H. Mastin, Jr., Kansas City, Mo., in reference to above bond [bond F. 1,774]. We have to state that the information contained in said letter is not sufficient to establish a claim under our bond. Therefore we beg to notify you that we shall reserve all our rights in the premises. Kindly forward to us at once for our information a verified statement setting forth the dates and amounts of each item of the alleged deficit and full particulars regarding same."

After receipt of the last letter plaintiff proceeded at much expense and trouble, occupying the time of a paid expert for two months, to prepare and send to defendant the information requested in its last

letter. This correspondence strongly suggests a waiver of any imperfect notice, if such had occurred; but we find no occasion to resort to that doctrine. The foregoing letters clearly indicate by their silence on the subject of notice that defendant had received all the notice required. No complaint concerning it is found; but in defendant's last letter it is strongly suggested that plaintiff had not made sufficient research into the accounts to give defendant such information as it required to determine its liability.

As we understand the argument of defendant's counsel, they place their reliance upon the evidence, disclosing plaintiff's knowledge, as early as April 23d, of facts which required it "immediately" thereafter to give the notice; and contend that, because no notice was given until the preliminary notice of May 28th and the final one of June 24th, it conclusively appeared that no immediate notice was given as required by the contract. We have already discussed and disposed of that contention, and our conclusion is only reinforced by the conduct of the parties after April 24th, as just detailed. From all the evidence we are clearly of opinion that the trial court committed no error in refusing to instruct a verdict for defendant on the ground that no immediate notice of loss was given to defendant.

The cases of National Surety Co. v. Long, 60 C. C. A. 623, 125 Fed. 887, and United States Fidelity Co. v. Rice, 78 C. C. A. 164, 148 Fed. 206, relied on by defendant, have no application to facts such as are disclosed by this record. In those cases notice was required to be given immediately after the occurrence of such a single definite and easily ascertained fact as readily permitted the court to fix the time when notice was required under the contract. In this case, on the contrary, so many elements of law and fact enter into a consideration of the time when notice was required as renders the determination thereof peculiarly appropriate for the jury.

Was there such a breach of warranty of failure to perform conditions on which the contract of indemnity was issued as precluded a recovery in this case?

Some time before February 24, 1903, defendant submitted to plaintiff a blank form of a statement, consisting of questions, with spaces left for the insertion of answers thereto, with the request that plaintiff fill in the appropriate answers and sign the statement. This document, so far as our present purpose requires, is as follows:

"Employer's statement covering application made by David O. Graves, of Kansas City, Mo., to the Ætna Indemnity Company, Hartford, Conn., for an indemnity bond in the position of cashier and bookkeeper under the service of the undersigned employer. In order that the above application may be passed upon at once, please answer fully all the following questions in so far as they apply to the given case and return at your early convenience. [Signed] E. S. Pegram, Secretary" [of defendant company].

"(1) Amount of bond?  $5,000.

"To date from?  February 1st, 1903, to February 15th, 1904.

"(2) To whom payable?  Give exact title.  The J. R. Crowe Coal & Mining Co.  *  *  *

"(14) Will he be authorized to sign checks on your behalf?  Yes.

"Will there be any countersignatures on such checks?  If so, whose?  General managers or presidents."

After answering many other questions which were propounded, the statement concluded with the following words:

"It is hereby agreed by the undersigned that the above answers are to be taken as conditions precedent to and as the basis of execution of the said indemnity bond and in consideration of the issuance of said indemnity bond by the company; it is further agreed that the checks and supervision above described shall be observed.

"[Signed]                                         **J. R. Crowe Coal & Mining Co.**"

Defendant averred in its answer that the contract sued on was made in reliance upon the statement of February 24th so made by the plaintiff, and that thereby plaintiff, among other things, warranted that Graves should not sign checks without the countersignature of either the general manager or president of plaintiff company, and that the plaintiff breached its warranty by subsequently, during the year covered by the contract, permitting Graves to sign checks without the safeguards agreed upon and warranted to be enforced.

For the purposes of the present discussion, we may assume that proof was offered and given tending to establish, among other things, that Graves was permitted to sign checks without any countersignature. The trial court, at the request of defendant, refused to instruct the jury that the answers contained in the statement of February 24th were warranties, and that if any of them was not true in fact the contract sued on was void, and refused on like request to instruct that, if checks were permitted to be signed by Graves without countersignatures of the general manager or president, the contract was avoided, and errors are duly assigned on the court's action.

Without referring to other breaches of warranty relied on by defendant, founded on the statement, the foregoing is deemed sufficient to fairly present the legal proposition involved.

Counsel for plaintiff contend that there is no sufficient evidence showing, or tending to show, that the renewal contract sued on was executed by defendant or accepted by plaintiff on the faith of the statement of February 24th, and therefore that no breach of any warranty contained in the statement, and no failures to perform any of its promises, can affect plaintiff's right of recovery in this case.

The contract sued on makes no reference to the statement of February 24th. It reads as follows:

"Hartford, Conn., June 30, 1903.

"In consideration of the payment of the sum of $20.00, being the premium for the third year upon bond F. 1.774 of the Ætna Indemnity Company for $5,000 issued June 1, 1901 on behalf of David C. Graves in favor of the J. R. Crowe Coal & Mining Company, Kansas City, Mo., said bond is hereby continued in force to June 1, 1904, subject to all the covenants and conditions thereof. * * *

"[Signed]                                         Charles Lindley, President.
"E. S. Pegram, Secretary."

The plain and unambiguous language of the contract just quoted shows that what the parties apparently did was to continue in force for a third year the original contract known as bond F. 1,774 "subject to all the covenants and conditions thereof," and, by fair and reasonable intendment, not subject to the terms and conditions of any

other instrument. The original bond 1,774 was a lengthy instrument containing many terms, covenants, and stipulations of the parties and filled with many conditions of defeasance of one kind or another. To all those terms, covenants, stipulations, and conditions the plaintiff clearly became bound, and any violation of any of them might ipso facto have defeated recovery on the contract as written. In the face of such affirmative reference to the terms and conditions of one instrument, and in the light of the accepted maxim "expressio unius exclusio alterius," it requires very clear proof that the parties intended to contract with reference to any other instrument containing other terms or conditions.

Turning now to the statement of February 24th, we perceive nothing in the terms employed or in any implications suggested to indicate an intention to make the statement the basis of or consideration for any renewal of the old bond. The request by defendant's secretary to answer the questions propounded found at the beginning of the statement was made in connection with the representation that Graves had just made an application to defendant for an indemnity bond which required immediate action by defendant. The general scheme of the statement and the language used indicate that the bond contemplated was a new one, just applied for by Graves, and one which should be dated February 1, 1903, and should run to February 15, 1904. By the last clause of the statement the answers made by the plaintiff were agreed to be taken as conditions precedent to and as the basis of execution of said indemnity bond; that is, the bond to run from February 1, 1903, to February 15, 1904. No intimation can be found indicating in the slightest degree that the parties intended the answers to the questions to be conditions precedent to or to form the basis of the execution of any other bond whatsoever, and certainly not of the renewal bond F. 1,774. The application and statement of February 24th seem to have been intended for the purpose of originating a new contract—certainly some contract other than the renewal of the old one of 1901. The parties were competent to contract and had it in their power either to renew the old or make a new contract. They determined to renew the old one, because they did it; and the application of Graves for a new one to date February 1, 1903, and running to February 15, 1904, was not accepted, because no such contract as that application contemplated was ever made. Accordingly, the agreement found at the end of the statement making the answers to questions propounded in it warranties or conditions precedent to the validity of the bond has no application to this case.

Parties have an undoubted right to make their own contracts, and, when they are reduced to writing in plain and unambiguous language, they must stand as written and be enforced accordingly. It does not follow that, because plaintiff proposed to defendant, or was willing to make the truth of certain statements a condition precedent to liability on one proposed contract, it intended to make those statements conditions of liability, if some other and different contract should be afterwards made by the parties.

But it is contended that, outside of the language employed by the parties in the written instrument, they agreed by correspondence that the warranties contained in the statement of February 24th should be conditions precedent to the validity of the contract renewing the old bond F. 1,774. We find no such agreement in any correspondence passing between defendant and plaintiff. Many letters passed between defendant and its local agents in Kansas City about the advisability of having an employer's statement different from that obtained from plaintiff prior to the execution of the original contract and of the necessity of having a different statement made before any further renewals should be granted. An effort was made to so connect the local agents with plaintiff as to raise a presumption that it must have known and assented to defendant's requirements, but such knowledge and consent was not in our opinion established.

If there is doubt and uncertainty about the effect of the correspondence upon the contract, they should, on familiar principles, be resolved in favor of sustaining the contract as made and signed, and not of defeating it; in favor of the insured, rather than the insurer. National Bank v. Insurance Co., 95 U. S. 673, 678, 24 L. Ed. 563; Grace v. American Central Ins. Co., 109 U. S. 278, 282, 3 Sup. Ct. 207, 27 L. Ed. 932; Moulor v. American Life Ins. Co., 111 U. S. 335, 341, 4 Sup. Ct. 466, 28 L. Ed. 447; London Assurance v. Companhia De Moagens, 167 U. S. 149, 159, 17 Sup. Ct. 785, 42 L. Ed. 113; Liverpool, etc., Ins. Co. v. Kearney, 180 U. S. 132, 136, 21 Sup. Ct. 326, 45 L. Ed. 460; McMaster v. New York Life Ins. Co., 183 U. S. 25, 40, 22 Sup. Ct. 10, 46 L. Ed. 64; Royal Ins. Co. v. Martin, 192 U. S. 149, 162, 24 Sup. Ct. 247, 48 L. Ed. 385; Bankers' Mutual Ins. Co. v. State Bank of Goffs (C. C. A.) 150 Fed. 78.

Without dwelling on the improbability of rational and experienced business men making a contract ignoring the language of the statement of February 24th, and expressly making it subject to the covenants and conditions of some other instrument, if they had in fact agreed that the contract should be subject to the conditions of that statement, a brief reference to certain undisputed proof and applicatory law will on other well-established principles dispose of this case. In December, 1902, when negotiations were in progress looking toward an extension of bond F. 1,774 for the second year, which had then partially expired, defendant wrote its local agents in Kansas City informing them that the employer's statement on which the original bond was based was not the proper one, and inclosed a blank form on which the statement of February 24th was subsequently written, to be filled out by plaintiff. The blank contained no reference to the original contract. It was left to plaintiff to fill it out as it desired. Accordingly, it filled it out as already seen, with no reference to the original contract, but with particular reference to a proposed bond. It amounted to a proposition to defendant, in effect, that if it would issue a new bond on Graves' pending application to date February 1, 1903, and to run to February 15, 1904, it would agree to perform certain conditions, and that the performance thereof should be a condition precedent to its validity. This proposition was forwarded to the home office of the defendant in New York and received there on the 2d day of March, following.

Some correspondence ensued between the defendant and its local agents in Kansas City, not shown to have been communicated to plaintiff. After which, defendant, regardless of the terms of plaintiff's proposition, returned to its agents, to be delivered to plaintiff, a renewal of the original bond insuring it against Graves' defalcations from June 1, 1902, to June 1, 1903.

After that renewal expired, without any further negotiations, and without making any reference to the proposition of February 24th, it executed its second renewal of the old bond, subjecting plaintiff, not to the covenants and conditions of the application and statement of February 24th, but to the terms and conditions of the old bond.

The contract sued on is essentially a contract of indemnity against loss, and the general rules governing the construction of ordinary life and fire insurance policies are applicable to it. Jackson v. Fidelity & C. Co., 21 C. C. A. 394, 75 Fed. 359, 365; Guarantee Co. v. Mechanics' Savings Bank, 26 C. C. A. 146, 80 Fed. 766; Champion, etc., Co. v. American Bonding & Trust Co., 115 Ky. 863, 872, 75 S. W. 197, 103 Am. St. Rep. 356; American Surety Co. v. Pauly, supra. The statement of February 24th was obviously made to secure favorable action on Graves' pending application, and in effect formed a part of it.

It is well settled that an application for insurance is a proposition to the insurance company which must be accepted as made, if at all. If a policy is executed and offered to the applicant different in any material respects from the application, it is in effect a rejection of the application, and a new proposition by the company, which the applicant may accept or reject at his pleasure. Insurance Co. v. Young's Administrator, 23 Wall. 85, 23 L. Ed. 152; Minneapolis, etc., Ry. Co. v. Columbus Rolling Mill, 119 U. S. 149, 7 Sup. Ct. 168, 30 L. Ed. 376; McNicol v. New York Life Ins. Co. (C. C. A.) 149 Fed. 141.

From the foregoing, as well as from a consideration of all the evidence, which has been critically examined, it is clearly apparent, we think, that defendant never accepted the proposition found in the statement of February 24th, but for reasons satisfactory to itself proposed to renew and to continue the liability created by the original contract. That proposition of defendant was accepted by plaintiff. It paid for and received the renewal contract. A loss occurred under it, and the defendant must be held to respond to its obligations created by it. We think there was no error in refusing to instruct that a failure to observe the conditions of the statement of February 24th entitled defendant to a verdict.

It is suggested that the trial court found as a fact that the statement of February 24th formed a part of the contract sued on. We do not so understand it.

The correspondence between defendant and its local agents at Kansas City, together with some oral testimony attempting to bring it home to plaintiff, was the only means by which defendant claimed to connect that statement with the contract. The contract itself made no reference to it, but did refer to another instrument as its basis. Apart from that correspondence, defendant's counsel neither in argument nor brief claimed that the statement was the foundation of the contract in suit or had any connection with it. All of that correspondence, and

the futile attempt to show plaintiff's consent to it, was offered subject to plaintiff's vigorous objection and exception. The court could only have received it subject to the requirement of bringing it home to plaintiff company. At the conclusion of all the evidence, the court obviously thought that no such connection had been made, for in its charge it made use of the following language:

"There was a good deal of correspondence, you will recall, introduced in evidence here between the indemnity company, in the East, and the local agents representing them, in Kansas City. I admitted that correspondence, not that I thought it was binding on the coal company, but I admitted that evidence to show the history and the development of the transaction."

The view of the trial judge so expressed was regarded by the defendant as fatal to its contention. This appears from the exception which it took to the charge in the following language:

"The defendant excepts to that part of the charge of the court in which the court charged the jury that the correspondence between the defendant and its agent in Kansas City was not binding on the plaintiff."

It is true that the court instructed the jury:

"That the employer's statement made by plaintiff dated February 24, 1903, and pleaded by defendant in its answer herein as being the basis and part of the contract of indemnity sued on. stands confessed by the pleadings and is admitted to have been executed and delivered to plaintiff by defendant."

But this is not a declaration that plaintiff admitted that the statement was the basis of the contract, or anything more than that it was executed and delivered for some purpose by it. If it was intended to state any further admission, the meaning of the pleadings was obviously misconceived.

The defendant pleaded as a part of its answer that plaintiff, on February 24, 1903, executed and delivered to it a statement partly in writing and partly in print, and, after setting out the same and the signatures of the parties thereto in full, made the further allegation that, upon the basis and in consideration of the statement so executed, it signed and delivered to plaintiff the contract sued on. The plaintiff for its replication filed a general denial, without verification, of all the allegations of the answer.

Section 746, Rev. St. Mo. 1899 [Ann. St. 1906, p. 731], provides that:

"When any petition or other pleading shall be founded upon any instrument of writing charged to have been executed by the other party, * * * the execution of such instrument shall be adjudged confessed unless the party charged to have executed the same deny the execution thereof by answer or replication verified by affidavit."

The failure of plaintiff to verify its replication justified the court in declaring what the proof unquestionably showed that the execution of the instrument was admitted, but did not justify it in declaring that it was admitted that the statement formed the basis of or constituted a part of the contract sued on, an issue which was the subject of spirited contest throughout the trial. That was an issue tendered separately from the other by the defendant, and one in which plaintiff ef-

fectually joined by the unsworn replication. Hart v. Harrison Wire Co., 91 Mo. 414, 421, 4 S. W. 123; Cox v. Bishop, 55 Mo. App. 135.

It is also true that the charge in some of its phases apparently proceeds on the palpably false assumption that, notwithstanding the fact that the correspondence and evidence failed to connect plaintiff with the statement, it and all its warranties and conditions were obligatory on the plaintiff; but it is likewise true, as already pointed out, that the court refused to give defendant's instructions that a breach of any of the warranties or conditions found in the statement would constitute a defense to the action. After a careful reading of the charge as a whole and of the requests refused, we have reached the conclusion that the court did not find, or intend to declare, that the statement of February 24th formed a part of the contract sued on. On the contrary, we reach the opposite conclusion, namely, that the court, by holding that the correspondence failed to bind plaintiff to its contents, and refusing to give defendant's requested instructions, necessarily concluded that the statement of February 24th was not a part of the contract sued on. Moreover, if the statement formed a part of the contract the evidence was clear and undisputed that there were such breaches of its warranties as precluded recovery by plaintiff, and rendered a verdict for defendant inevitable. But the court itself obviously did not think that such result was inevitable, because it permitted a recovery by plaintiff, and after full deliberation denied a motion for a new trial. No court would have granted a new trial quicker for a disregard by the jury of its instructions than the learned court from which this case came. For the foregoing reasons, we think the finding of the jury is not necessarily contrary to the charge. Where the record does not clearly show that the finding is contrary to the instruction of the court when taken as a whole, the presumption is that the jury followed it, and that the verdict is right. Gregory v. Morris, 96 U. S. 619, 24 L. Ed. 740.

It is further suggested that the judgment cannot be affirmed without improperly taking cognizance of errors committed against plaintiff when it has prosecuted no writ of error in its own behalf, and that, if we could do so, the defendant was by the effect of the combined errors deprived of a trial according to the law and evidence, was made to try a false issue, and that other issues in the case were obscured to the prejudice of the defendant by the submission of the false issue and confused instructions concerning it. We cannot appreciate the force of these suggestions because of the condition of the record and charge of the court already considered, and particularly because of the fact that counsel for defendant has assigned no error calling our attention to those features of the trial. It is true a general assignment of error was made, based on the court's refusal to instruct a verdict in favor of the defendant.

But rule 24 of this court provides that the brief of the plaintiff in error "shall contain," among other things, "a specification of the errors relied upon and shall set out separately and particularly each error asserted and intended to be urged." That rule was intended to sharply direct the attention of the court to the vital questions at issue and to require the argument of counsel to be concentrated upon the important questions in controversy. City of Lincoln v. Sun Vapor Street-Light

Co., 8 C. C. A. 253, 59 Fed. 756, 758. Counsel for defendant conformed to this rule, and specified the errors which they are now relying upon, and gave several reasons why the peremptory instruction should have been given in its favor, without making any complaint or remotely suggesting that any false or misleading issue had been tried, or that any combination of errors had deprived it of a trial on the law and the evidence, or that any issue had been confused. If the defendant has not yet appreciated that it did not get a lawful trial or was otherwise prejudiced by the proceedings below, we do not deem it our duty to act for it and assign errors in its behalf.

Again, if any false issue was tried below, it was by defendant's own procurement. It offered the correspondence to show an agreement between the parties that the statement of February 24th should form the basis of the contract sued on. That evidence was objected to by plaintiff, and admitted at defendant's insistence, over plaintiff's protest. It signally failed to support defendant's contention, and should have been excluded or ultimately ruled out. The experiment, or false issue, as it is called, was therefore of defendant's own seeking and at plaintiff's great trouble and expense. Defendant, even if it had assigned the trying of such false issue as error, cannot be heard to complain of the consequences of that error because it brought them upon itself.

After a careful and critical consideration of the terms and conditions of the contract as actually executed by defendant company and of all the evidence introduced by defendant to add to or vary those terms and conditions, we cannot, under well-settled law recently stated by this court in Connecticut Fire Ins. Co. v. Buchanan, 73 C. C. A. 111, 141 Fed. 877, 4 L. R. A. (N. S.) 758, reach any other conclusion than that there was no competent evidence to ingraft upon the contract as executed any of the warranties or conditions found in the statement of February 24th. The judgment was in harmony with this conclusion, and at another trial, so far as this issue is concerned, no other judgment could be lawfully rendered. If, therefore, any errors were committed adverse to defendant's contention, or even if the court adopted any erroneous theory, the record conclusively shows that neither of them were or could have been prejudicial to the defendant's real rights. Such should therefore, in the interests of a rational administration of justice, be disregarded.

It was recently held by this court that, even if a trial proceeded on an erroneous theory, if the judgment reached was for the right party, it, in the interests of substantial justice, should not be reversed when it is clear that the erroneous procedure or error did not prejudice, and could not have prejudiced, the rights of the losing party. Cook v. Foley (C. C. A.) 152 Fed. 41. With that reasonable doctrine we fully agree, and we think the present case is brought within its contemplation. We cannot see how the confusion or error, if any such existed in the trial of the issue last referred to, injuriously affected the defendant's chances for a fair trial on the other issues of the case; but if they had any tendency in that direction, and even did prejudicially affect the defendant's rights, it is not complaining about it. No assignment of error to that effect is either made, specified in the brief, or argued by its counsel. In such circumstances we cannot interfere.

Was the verdict excessive or contrary to the court's instruction?

We are not at liberty to consider the first part of this question. The action of the trial court in allowing the verdict to stand concludes review by us. Illinois Cent. R. Co. v. Davies, 76 C. C. A. 613, 146 Fed. 247, and cases cited. But whether the verdict so contravenes the court's instructions as to require a reversal of the judgment is open for consideration. The court gave a certain instruction relating to the allowance of a credit in favor of the defendant of the sum of $1,500. The facts out of which any claim to such a credit could arise are as follows: Crowe, the president of the company, with a view of encouraging the employé in the early stage of his employment, sold him at a low price and on credit a few shares of his individual holdings of the capital stock of the plaintiff company, with an understanding that such dividends as should be declared on the shares and such moneys as Graves might from time to time pay on account should be applied towards the agreed price, and with the further understanding that, whenever Graves should leave the service of the company, the shares should be returned to Crowe, and that he should refund to Graves the aggregate of what he might have paid on them. Graves died in May, 1904, and under the agreement between him and Crowe the amount of $1,500 was due from Crowe to Graves' estate, pursuant to the understanding mentioned. The defendant pleaded in its answer that this money was held by the company for the purpose of being applied in reduction of Graves' defalcation, and asked that the amount thereof be credited to the defendant on whatever liability should be established against it. The instruction in question is not entirely clear. Two different meanings are imputed to it by opposite counsel; one consistent with the verdict, and the other inconsistent with it. Under no conceivable view of the facts did the plaintiff company have any funds in its hands belonging to Graves which could or should have been applied by way of reduction of the amount due it by reason of Graves' defalcation. The jury, doubtless, did not understand the instruction to require the allowance in favor of the defendant, and did not make any such allowance in reaching its verdict, and it is fairly to be presumed, from the fact that the learned trial court did not set aside the verdict, that he did not understand the jury had misinterpreted the instruction in question. Where the record does not clearly show that the finding of the jury is contrary to the instruction of the court, the presumption is that they followed it. Gregory v. Morris, supra. In any event, the failure to allow the credit of $1,500 did not prejudicially affect defendant's rights. The verdict reached was in strict accord with the proof touching the amount of Graves' embezzlement during the year covered by the contract, and if the jury had allowed the unjust and unwarrantable credit it would have been error. We will not strain ourselves to find a technical error in procedure which will result in a substantial error in fact.

Were the instructions given to the jury on the subject of "immediate notice" erroneous?

We have carefully examined the full charge and all the observations of the court bearing upon the meaning of the words "immediate notice of loss," as found in the contract sued on, and find them in substantial

accord with the views already expressed by us on that subject. We are unable to say that the disconnected expression complained of by defendant's counsel, when taken in connection with the whole charge, conveyed any false impression to the jury.

We have now considered all the important questions argued by counsel. Others of less moment are suggested in the assignment of errors. To them we have given careful consideration, and, finding nothing in them to affect the result already foreshadowed, the judgment must be affirmed, and it is so ordered.

SANBORN, Circuit Judge (dissenting). The main defense of the Ætna Company was that the employer's agreement of February 24, 1903, constituted the inducement of, and became a part of, the contract of indemnity made on March 12, 1903, and renewed on June 30, 1903, and that the covenants of the Crowe Company therein, to the effect that there should be a countersignature of general managers or presidents of the company upon the checks signed by Graves, and that the bankbook should be balanced and compared monthly with the cashbook by some other officer or person, had been broken, and that the Crowe Company falsely stated in this agreement that Graves' accounts had been examined on February 12, 1903, and had been found correct with funds on hand to balance. To this defense two principal facts were essential: (1) That the statement of February 24, 1903, was the inducement and became a part of the contract; and (2) that its covenants were broken, or its statements false. The court below received the evidence offered by the Ætna Company to establish the first fact, held that this evidence conclusively proved it, charged the jury to that effect, and submitted the other issues of fact to them upon that adjudication. The employer's statement contained this covenant by the Crowe Company:

"That the above answers are to be taken as conditions precedent to and as the basis of execution of said indemnity bond, and in consideration of the issuance of said indemnity bond by the company, it is further agreed that the checks and supervision above described shall be observed."

The Ætna Company proved without contradiction that more than 300 checks, which aggregated more than $150,000, were issued by Graves without the countersignatures covenanted; that the loss complained of resulted in large part, if not entirely, from the use of these checks; and there was evidence, conclusive to my mind, that no useful comparison of the bankbook with the cashbook was ever made by any other officer. These facts, indeed the simple undisputed fact that these checks were issued without the countersignatures, and that they caused the loss, constituted a complete defense to this action, in view of the finding of the court below that the statement was a part of the contract, because they conclusively demonstrated the fact that the Crowe Company had committed the first substantial breach of the agreement, which consisted of mutual covenants, and that by the terms of its contract the policy was avoided. Rice v. Fidelity & Deposit Co., 103 Fed. 427, 433, 43 C. C.A. 270, 276; Hunt v. Fidelity & C. Co., 99 Fed. 242, 245, 39 C. C. A. 496, 499; National Surety Co. v. Long, 125 Fed. 887, 60 C. C.

154 F.—36

A. 623; U. S. Fidelity, etc., Co. v. Rice, 78 C. C. A. 164, 148 Fed. 206; Groton Bridge & Mfg. Co. v. Clark Pressed Brick Co., 136 Fed. 27, 33, 60 C. C. A. 577, 583; Atlas Reduction Co. v. New Zealand Ins. Co., 138 Fed. 497, 498, 71 C. C. A. 21, 22. The court below therefore erred when it refused to instruct the jury to return a verdict for the Ætna Company, and when it declined to charge them, as requested, that, if the coal company failed to perform any of its agreements in its statement which related to the future, the contract of indemnity was released, and when it refused to instruct them, as requested, that the truth of its answers therein relative to the past was material to the validity of the contract of indemnity. On account of these and other errors, the judgment below ought to be reversed, and a new trial of this action should be ordered.

The majority of the court concede these errors. They agree that if the employer's statement was the inducement, and became a part of the contract of indemnity, the Ætna Company's defense was complete, and the court should have instructed the jury to return a verdict in its favor. But they are of the opinion that the judgment should be affirmed because they think that the court did not hold or instruct the jury that the employer's statement became a part of the contract, because in their opinion there was no substantial evidence to that effect, and because, if the court held that this statement was a part of the contract, this was, in their opinion, an error in favor of the Ætna Company which offsets the fatal error against it.

With great respect for, and deference to, their judgment I have found it impossible to bring my mind to their conclusions.

1. That the trial court held and instructed the jury that the employer's statement of February 24, 1903, was the inducement and became a part of the contract of indemnity in suit is demonstrated to my satisfaction by these facts, which the record discloses:

(a) When the employer's statement was first offered in evidence, the court reserved its ruling. After 12 letters, 2 renewal certificates, and 30 pages of oral testimony had been received to prove that it was the inducement of, and that it became a part of, this contract, the Ætna Company again offered the statement, the court admitted it in evidence over the objections of the Crowe Company to the effect that the evidence was insufficient to prove that it was a part of the indemnity contract, and no countervailing evidence upon this subject was ever produced.

(b) The court did not submit to the jury the question whether or not the employer's statement of February 24, 1903, was the inducement and a part of the contract; but in delivering its charge it read to them certain questions and answers which this statement contained, and it instructed them that if the Crowe Company fraudulently made those answers, or if it dishonestly or negligently failed to fulfill the promises which they evidenced, it could not recover in this action.

(c) It did positively instruct the jury that this statement became the basis and a part of the contract in these words, the first part of which may be found in the opinion of the majority:

"There was a good deal of correspondence, you will recall, introduced in evidence here between the indemnity company, in the East, and the local agents representing them, in Kansas City. I admitted that correspondence, not that I thought that it was binding on the company, but I admitted that evidence to show the history and development of the transaction. It resulted in the end in the indemnity company insisting upon an application and questions according to the form that they insisted should be used [this form was the employer's statement of February 24, 1903], rather than a form used for fraternal organizations, and which perhaps had been used upon a prior occasion. Then it was that the coal company made answers to certain questions which are very important and material in your deliberations in the jury room after you have retired to consider your verdict."

The court here read to the jury many of the questions and answers in this statement, and then continued in this way:

"Now, in answering those questions, the coal company further agree, over their signature, that the above answers are to be taken as conditions precedent to and as a basis of execution of said indemnity bond, and in consideration of the issuance of said indemnity bond by the company it is further agreed that the checks and supervisions above described shall be observed. So that, as the company had the right to insist upon that, and, secondly, as the company had the right to cancel and terminate this bond at any time, with or without good reason, simply by so electing and so declaring in writing to the coal company, the mere fact that these questions and answers were made in February, 1903, would date back as well as ahead and form a part of the bond upon the part of the coal company upon which the obligations of the indemnity company would rest, and which must be construed together as one contract, although upon two separate pieces of paper, and which must be taken together."

And, again, the court charged:

"Now, the indemnity company made these questions and answers precedent to a recovery upon this bond. * * * So that the indemnity company had the right to have these questions answered, and one of the questions here is: Were they fairly and truthfully answered?"

And then the court proceeded to and did submit that question to the jury under erroneous instructions, when, as all the members of this court agree, the evidence conclusively answered it in the negative.

Can there be any doubt, in view of these facts and these instructions, that the court below held and charged that the employer's statement was the basis and a part of the contract in suit? The fact that the court failed to grant a new trial furnishes no evidence to the contrary. On the other hand, it tends to prove that the trial court adhered to its holding at the trial, that it still held that the statement was a part of the contract, but that the evidence failed to conclusively prove a breach of its covenants. The result is that the court held and charged that the employer's statement was the basis of, and a part of, the contract, and submitted to the jury the question whether or not the Crowe Company had broken the covenants it had made therein, when the evidence was conclusive that it had done so, and the court should have given the peremptory instruction for the Ætna Company, which it requested. The failure to give this instruction was an error both prejudicial and fatal to the Ætna Company's case. If it had been given, the verdict and judgment would have been in its favor, and the Ætna Company assigned and relies

upon this error for its reversal. On account of it, it is in my judgment entitled to a new trial.

2. An endeavor will be made later to show that there was substantial evidence that this employer's statement was the inducement and a part of the contract, and that the trial court was right in its ruling to that effect.

But, if that court was in error in this respect, that error is not assigned, and it does not extract the vice of the fatal error challenged by the Ætna Company. In an action at law, a federal appellate court has no jurisdiction to try the case anew and to determine whether or not the judgment is for the right party. It is a court authorized to review and correct the errors of law of the court below in the trial of the case, and these alone; nor may it lawfully weigh and offset the errors challenged by the plaintiff in error against those against the defendant in error which are not assigned and affirm or reverse the judgment, as in its opinion the balance turns. Every litigant is entitled to a trial by jury of every issue of fact in his case without any error of law in the trial or the instructions; and, if any error prejudicial to him has crept into the trial, he is entitled to a new trial by the jury without error, although the first trial may have bristled with errors in his favor. Two errors do not make a trial without error, any more than two wrongs make a right.

It is true that, where a successful party was entitled upon all the issues and upon all the evidence in the case to a peremptory instruction in his favor, when the defeated party had introduced all his evidence and rested his case, and it is plain that the latter could have produced no other evidence, errors in subsequent instructions to the jury may be disregarded, because the defeated party could not have recovered in such a case in any event, and hence such errors could not have prejudiced him. It was upon this ground, and not upon the ground that the court could try the case de novo and affirm the judgment if it was for the right party, that the judgment in the late case of Cook v. Foley (C. C. A.) 152 Fed. 41, was affirmed. In that case the court held that the defeated parties were permitted without objection to bring forward all the proofs which they had, and to try out the single issue which conditioned their entire claim, the issue whether or not there was fraud or gross mistake in the employer's estimates, and that they produced no evidence to sustain it. In that case it appeared in this way that they were not, and could not have been, prejudiced by the rulings in the charge, because they could not recover upon the entire evidence in any event.

But where there remains any issue for the jury, as there does remain in this case, the issue of notice in any event, there this rule is inapplicable, because the fact does not appear and cannot be made to appear beyond doubt that the erroneous ruling did not prejudice and could not have prejudiced the defeated party.

The legal presumption is that error produces prejudice. It is only when the fact so clearly appears as to be beyond doubt that an error challenged did not prejudice, and could not have prejudiced, the complaining party, that the rule that error without prejudice is no ground for reversal can have effect. Deery v. Cray, 5 Wall.

795, 807, 808, 18 L. Ed. 653; Peck v. Heurich, 167 U. S. 624, 629, 17 Sup. Ct. 927, 42 L. Ed. 302; Smith v. Shoemaker, 17 Wall. 630, 639, 21 L. Ed. 717; Moores v. Bank, 104 U. S. 625, 630, 26 L. Ed 870; Gilmer v. Higley, 110 U. S. 47, 50, 3 Sup. Ct. 471, 28 L. Ed. 62; Railroad Co. v. O'Brien, 119 U. S. 99, 103, 7 Sup. Ct. 118, 30 L. Ed. 299; Mexia v. Oliver, 148 U. S. 664, 673, 13 Sup. Ct. 754, 37 L. Ed. 602; Railroad Co. v. O'Reilly, 158 U. S. 334, 337, 15 Sup. Ct. 830, 39 L. Ed. 1006; Railroad Co. v. McClurg, 8 C. C. A. 322, 325, 326, 59 Fed. 860, 863; Association v. Shryock, 20 C. C. A. 3, 11, 73 Fed. 774, 781; Railroad Co. v. Holloway, 52 C. C. A. 260, 114 Fed. 458; Armour & Co. v. Russell, 75 C. C. A. 416, 144 Fed. 614, 615.

This was a trial by jury. The seventh amendment to the Constitution reads:

"In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved; and no fact tried by a jury shall be otherwise re-examined, in any court of the United States, than according to the rules of the common law."

Of the latter clause the Supreme Court said, in Parsons v. Bedford, 3 Pet. 433, 446, 448, 7 L. Ed. 732:

"But the other clause of the amendment is still more important, and we read it as a substantial and independent clause: 'No fact tried by a jury shall be otherwise re-examined, in any court of the United States, than according to the rules of the common law.' This is a prohibition to the courts of the United States to re-examine any facts, tried by a court, in any other manner. The only modes known to the common law to re-examine such facts are the granting of a new trial by the court where the issue was tried, or to which the record was properly returnable; or the award of a venire facias de novo by an appellate court, for some error of law which intervened in the proceedings."

And this statement has been often reaffirmed by the Supreme Court. Barreda v. Silsbee, 21 How. 146, 166, 16 L. Ed. 86; Justices v. Murray, 9 Wall. 274, 277, 19 L. Ed. 658; Miller v. Life Ins. Co., 12 Wall. 285, 300, 20 L. Ed. 398; Insurance Co. v. Comstock, 16 Wall. 258, 269, 21 L. Ed. 493; Insurance Co. v. Folsom, 18 Wall. 237, 249, 21 L. Ed. 827; Railroad Co. v. Fraloff, 100 U. S. 24, 31, 25 L. Ed. 531; Lincoln v. Power, 151 U. S. 436, 438, 14 Sup. Ct. 387, 38 L. Ed. 224; Chicago, Burlington & Q. R. Co. v. Chicago, 166 U. S. 226, 246, 17 Sup. Ct. 581, 41 L. Ed. 979; Capital Traction Co. v. Hof, 174 U. S. 1, 9, 19 Sup. Ct. 580, 43 L. Ed. 873.

This appellate court, therefore, has no power to re-examine the issue of fact whether or not the employer's statement became a part of the indemnity contract. The only way in which that issue can be lawfully re-examined is by the grant of this court of a new trial by a jury on account of an error in law at the former trial. The Ætna Company has the constitutional right to a trial of that issue by a jury; that is to say, by a trial court consisting of a judge and a jury, a court presided over by a judge, who assists and directs the jury and makes his rulings upon the admission and rejection of evidence and announces the rules of law which govern the trial in the trial court where the parties and witnesses are present and ready to submit their proof and conform their acts to those rulings. A jury trial is not a trial by 12 men, nor by an appellate court, but by 12 men presided over

by a judge, who makes his rulings in the course of the trial while witnesses and parties are present and ready to act.

The reason why the appellate court may not lawfully disregard conceded errors properly assigned, because there were counter errors, is that the litigants have the right to correct rulings at the trial and not in the appellate court alone, to the end that they may know, while they are trying the case, while they have their witnesses and evidence at hand, to what issues to direct their proof and how to conduct their trial in view of the rules of law which the court finds control the hearing. One has no just and fair trial by jury according to the course of the common law who is compelled to go to the jury under erroneous rulings and instructions, and, when right rulings are announced by an appellate court, is deprived of all opportunity to present his witnesses and his evidence in the light and knowledge of the correct rulings. No better illustrations of this rule can be found than the case at bar, in which it seems to me it is to be disregarded, and the cases from the Supreme Court which follow, in which it is asserted and applied.

At the trial below the court received in evidence, upon the issue of fact whether or not the statement became a part of the contract of indemnity, 12 letters, 2 other writings, and more than 30 pages of oral testimony, and then admitted in evidence the statement, and held, and charged the jury, that it was a part of the contract of indemnity. Of course, when the court below admitted the statement in evidence and held that the proof which had been presented made it a part of the contract, the Ætna Company offered no more evidence upon that issue. If the court had held otherwise, the Ætna Company would have had the opportunity to introduce, and doubtless it would have introduced, other evidence to establish the fact, for the record strongly indicates that there was such. That company relied, however, as it had a right to rely, upon the ruling of the court that this fact was established, and upon that basis it prepared its argument and presented its case to the jury. If, after receiving all this evidence and holding this fact established, the court below had rejected it in its charge and had instructed the jury that it did not establish the fact, it would have committed reversible error, because it would thereby have deprived the Ætna Company of the opportunity to supply its place with better testimony or to supplement it with other testimony, and also of its opportunity to prepare and argue its case to the jury upon the decisive issues in the case alone. Harkison v. Harkinson, 41 C. C. A. 201, 101 Fed. 71.

In a trial according to the course of the common law, every litigant is entitled, before he goes to the jury, to a ruling upon the admissibility of his evidence and upon its sufficiency to be submitted to the jury to establish the issuable fact to which it is directed, to the end that he may have an opportunity to produce other and better evidence, if necessary, and to properly prepare and argue his case to the jury.

If this court now withdraws all the Ætna Company's evidence upon this crucial issue from the case, or if it here adjudges it insufficient to establish the fact which the court below held it did establish, that

company is thereby deprived of its rightful opportunity to produce other and better evidence and to properly prepare and argue its case to the jury.

In Deery v. Cray, 72 U. S. 795, 806, 807, 18 L. Ed. 653, the court erroneously rejected a deed offered by the plaintiff. The defendants then introduced in evidence a deed and a chain of title thereunder which established a perfect title in them, even if the plaintiff's deed was admitted in evidence, and when he sued out a writ of error they met him with the proposition that the rejection of his deed, if erroneous, was conclusively shown to have been error without prejudice. But the Supreme Court overruled the position, upon the ground that, while it appeared by the record that the error was not prejudicial, it might not have appeared so if the plaintiff's deed had not been rejected, because she might then have proved that the defendants' deed was a forgery or have established some other fact fatal to it. The case is not only persuasive, but controlling, here, for, if it now appears that there was no substantial evidence that the employer's statement became a part of the contract, the Ætna Company might and doubtless it would have produced other evidence that it was so, if the court below had not held that its evidence was sufficient to establish that fact and submitted to the jury the issue of its breach upon that assumption. To the same effect is Peck v. Heurich, 167 U. S. 624, 629, 17 Sup. Ct. 927, 42 L. Ed. 302.

Again, the error of the court below, if any, in receiving the evidence and holding it to be conclusive that the employer's statement became a part of the contract, is not reversible here, because the Crowe Company sued out no writ of error, and a defendant in error who does not sue out a writ of error himself cannot, by assigning cross-errors, or by brief or argument, confer jurisdiction upon an appellate court to consider, review, or decide rulings against him in the court below. Bolles v. Outing Co., 175 U. S. 262, 268, 20 Sup. Ct. 94, 44 L. Ed. 156; Cleary v. Ellis Foundry Co., 132 U. S. 612, 614, 10 Sup. Ct. 223, 33 L. Ed. 473; Canter v. American, etc., Ins. Co., 3 Pet. 307, 318, 7 L. Ed. 688; Chittenden v. Brewster, 2 Wall. 191, 196, 17 L. Ed. 839; Loudon v. Taxing District, 104 U. S. 771, 774, 26 L. Ed. 923; The Maria Martin, 12 Wall. 31, 40, 20 L. Ed. 251; Clark v. Killian, 103 U. S. 766, 769, 26 L. Ed. 607; U. S. v. Blackfeather, 155 U. S. 180, 186, 15 Sup. Ct. 64, 39 L. Ed. 114; The Stephen Morgan, 94 U. S. 599, 24 L. Ed. 266; Building & Loan Ass'n v. Logan, 14 C. C. A. 133, 134, 66 Fed. 827, 828; Guarantee Co. v. Phenix Ins. Co., 124 Fed. 170, 59 C. C. A. 376; Pauly, etc., Mfg. Co. v. Hemphill Co., 10 C. C. A. 595, 600, 62 Fed. 698, 703.

In Chittenden v. Brewster, 2 Wall. 191, 196, 17 L. Ed. 839, the plaintiff appealed, and the defendant attempted, as here, to defeat his appeal because he had failed to prove facts essential to his case, to wit, the issue and return unsatisfied of an execution; but the Supreme Court refused to consider this failure of proof or the error which the appellees averred because the latter had not appealed, and said:

"If the appellees desired to avail themselves of this error in the decree, they should have brought a cross-appeal. By omitting to do so, they admit the correctness of the decree as to them. The case stands before the appellate tribunal the same as if the error had been waived at the hearing."

In Cleary v. Ellis Foundry Co., 132 U. S. 612, 10 Sup. Ct. 223, 33 L. Ed. 473, the writ of error was sued out by the plaintiff; but the plaintiff had proved no case, because the evidence conclusively established the fact that his cause of action was barred by the statute of limitations, and the defendant had saved this error by objection and exception, but had sued out no writ of error. The Supreme Court held that it could not take cognizance of or hear this objection, and it affirmed the judgment against the defendant.

In Bolles v. Outing Co., 175 U. S. 262, 268, 20 Sup. Ct. 94, 44 L. Ed. 156, the plaintiff sued out a writ of error, and the defendant urged two defenses, which, if sustained, were fatal to his recovery; but it had not sued out a writ of error. The Supreme Court said:

"It is sufficient to say of these that the defendant did not take out a writ of error, and cannot now be heard to complain of any adverse rulings in the court below."

So imperative and indubitable was this rule found to be, after briefs, arguments, and deliberate consideration, that, in a case in which the defendant below sued out a writ of error, the plaintiff, without suing out a writ, argued and insisted in its brief that a judgment against it could not stand because there were errors in the rulings of the court below against it upon the trial, and this court refused to consider or review these rulings, and ordered judgment against the plaintiff, that we were compelled to hold upon a writ of error subsequently sued out by the plaintiff that the judgment we had directed must be reversed for the very errors which the plaintiff had tried to present in answer to the first writ, and that our judgment upon that writ did not render the questions which these errors presented res adjudicata. Guarantee Co. v. Phenix Ins. Co., 124 Fed. 170, 59 C. C. A. 376; Wickliffe v. Buckman, 12 B. Mon. (Ky.) 424; Smith v. Bogenschultz, 14 Ky. Law Rep. 305, 20 S. W. 390, 391.

When a case comes to an appellate court upon a writ of error of one party only, the errors in his favor are waived by his opponent, and the question for the appellate court is: Were the rulings challenged by the writ and the assignment of errors erroneous, upon the assumption that those not thus challenged were correct? And the coal company has no right in this case to the consideration and review of the rulings against it upon the admission, or upon the effect of the evidence offered and received to establish the fact that the employer's statement was the inducement and a part of the contract of indemnity.

Moreover, if there was no evidence that the statement was a part of the indemnity contract, the submission to the jury of the questions upon its breach and the charge of the court upon them constituted fatal and prejudicial errors, because they tended to withdraw the attention of the jury from the issues actually involved, and to lead them to decide the case upon false issues, and in that way to reach an erroneous result. Every litigant has the legal right to a fair and impartial

trial of the issues which his case presents according to the law and the evidence applicable to those issues alone. The submission to the jury for their consideration of extraneous issues or of evidence which is neither relevant nor material to the questions upon trial is a violation of this right, and it constitutes a fatal error, because it tends to withdraw the attention of the jury from the issues involved, and to lead them to decide the case upon false issues, and in that way to reach an erroneous result. Northwestern Life Ins. Co. v. Stevens, 18 C. C. A. 107, 112, 71 Fed. 258, 263; Railroad Co. v. Houston, 95 U. S. 703, 24 L. Ed. 542; Railroad Co. v. Blessing, 14 C. C. A. 394, 398, 67 Fed. 277, 281; Union Pac. R. Co v. Field, 137 Fed. 14, 15, 69 C. C. A. 536, 537; Frizzell v. Omaha St. Ry. Co., 59 C. C. A. 382, 381, 121 Fed. 176, 178; Equitable Life Assur. Co. v. McElroy, 28 C. C. A. 365, 376, 83 Fed. 631, 642; Sparks v. Territory of Oklahoma, 146 Fed. 371, 373, 76 C. C. A. 591.

The majority argue that the error of the submission of these false issues cannot be considered, because it was invited by, was favorable to, and was not assigned as error by, the Ætna Company; but the Ætna Company appears to me to have objected to, and to have assigned as error, the submission of these issues to the jury, when it requested a peremptory instruction that they should not be submitted, and that the court should direct a verdict in its favor. However this may be, the ruling which makes these issues false is not yet made, and will not be made until the opinion in this case is filed. It is in argument to persuade against, and if possible to prevent, this court from affirming the judgment, on the ground that the ruling of the court below that the employer's statement was a part of the contract was erroneous, and to prevent it from thereby making the issues under that statement false, that the contention is made that, even if that conclusion were reached, there would still be reversible error in the trial, because under that holding the case would have been submitted to the jury upon false issues. It cannot be necessary to object, except, and assign error to the possible ruling or decision of an appellate court which opposing counsel seek to secure before it is announced in order to be heard to present reasons why it ought never to be made.

The considerations and decisions which have now been presented have led my mind to this conclusion. The conceded error of the court in refusing to instruct the jury, as requested, that the evidence conclusively established the breach of the covenants of the employer's statement, when it had held and charged that this statement constituted the basis and a part of the contract of indemnity in suit, entitles the Ætna Company to a new trial of this case, even if the latter ruling was erroneous, and there was no substantial evidence to sustain it (1) because a refusal to grant a new trial on the latter ground deprives the Ætna Company of a jury trial of its case according to law without error, in that it deprives it of notice and knowledge of the incompetency and insufficiency of its evidence, which the trial court held competent and sufficient, at the time of and during the trial, while witnesses and evidence are at command, and there is yet time and opportunity to present them, and of its opportunity to replace or supple-

ment its insufficient evidence and to prepare and present its evidence and its case to the jury with knowledge of the correct rulings of law applicable to its trial, and thus deprives it of undeniable rights, opportunities, and attributes of every fair trial by jury; (2) because the error, if any, in the ruling that the statement is a part of the contract, is not challenged by writ of error, and is not reviewable in this case; and (3) because, if it were error, and were reviewable, there would still be reversible error in the trial, in that the case was submitted to the jury under false issues and erroneous instructions.

3. There was substantial evidence, sufficient to sustain the verdict of a jury, that the statement was the inducement of, and a part of, the contract of indemnity made in March, 1902, renewed in June, 1903, and that question was for the jury, and not for the court below, nor for this court.

The record discloses these uncontradicted facts: The original bond indemnified the Crowe Company from June 1, 1901, to June 1, 1902. The indemnity was extended from June 1, 1902, to June 1, 1903, by a renewal receipt, which was delivered to the Crowe Company on March 12, 1903. It was again extended from June 1, 1903, to June 1, 1904, by a renewal receipt dated June 30, 1903. The embezzlements for which the Crowe Company recovered in this suit extended from May 28, 1903, to April 22, 1904, and a part of them fell under the first, and a part under the second, renewal. If there was any evidence that the employer's statement became a part of the contract which worked the first renewal, it cannot be disregarded, because that covers a portion of the embezzlements recovered. One Mastin was a member of a firm of insurance agents at Kansas City, the place of business of the Crowe Company, and a personal friend of J. R. Crowe, the president of that company. The Ætna Company's place of business was Hartford, in the state of Connecticut. Mastin's firm were the agents of the Ætna Company, delivered to Crowe the original bond, and issued other insurance from other companies to the Crowe Company. He testified that all the business between the Ætna Company and the Crowe Company was conducted through his firm; that, whenever they would receive a letter from the Ætna Company which involved answering, they would inform the Crowe Company, and then, after seeing them, would ordinarily report or write back to the Ætna Company; that it was necessary, he believed, to have those employers' statements signed, or was the custom of the companies to have them signed, before they issued the renewals; and that the letters between the Ætna Company and the Crowe Company and their inclosures were sent and received. On August 26, 1902—the bond had expired on June 1st preceding—the Crowe Company had no existing indemnity, and Mastin's firm wrote the Ætna Company that the Crowe Company wanted the bond continued; but Crowe was out of town, and they could not get an employer's statement from him. On October 3, 1902, the Ætna Company answered, inquired if Crowe had returned, and requested an employer's renewal certificate. On October 13, 1902, Mastin's firm wrote that they had no employer's statements and asked for a supply. On October 17, 1902, the Ætna Company answered, inclosed an employer's renewal certificate under bond F. 1,774, David C. Graves, asked them to

have it completed in full by the company, and added: "If everything is satisfactory, renewal receipt will be issued continuing bond in force for the remaining year." On November 11, 1902, Mastin's firm wrote the Ætna Company and inclosed the employer's renewal certificate signed by the Crowe Company. On November 25th following, the Ætna Company answered that it had received the letter of November 21st and the employer's renewal certificate therein, but wrote:

"Upon examining this certificate, we find that there is no mention in same as to when the last examination or audit took place. We therefore cannot issue this renewal receipt until we have some advice when the accounts were last audited. We inclose herewith another blank, which please have filled in properly, and if everything is satisfactory, renewal receipt will be issued."

On December 22, 1902, Mastin's firm wrote the Ætna Company and inclosed a second employer's renewal certificate signed by the Crowe Company. This certificate stated that Graves' accounts were last examined or audited on August 1, 1901, by H. D. Buchanan and were found correct up to July 1, 1901. On December 26, 1902, the Ætna Company answered thus:

"We have for acknowledgment your favor of the 22d inst. inclosing employer's renewal certificate in connection with our bond No. F. 1,774, covering Mr. David C. Graves, in favor of the J. R. Crowe Coal & Mining Company. This bond was not renewed when it expired on June 1, 1902, owing to the fact of our inability to obtain employer's renewal certificate properly made out. The renewal certificate which you have now forwarded us is properly made out, but we note that the last examination or audit of Mr. Graves' account took place on August 1, 1901. This is entirely unsatisfactory to us as the failure to make an audit in a period of nearly a year and a half is from our point of view a serious drawback to renewing this business. We might also say that, when this bond was originally issued, we did not obtain the proper form of employer's statement for this class of risk, as you sent us the short form F. 3 which is used for fraternal societies and the like, instead of form F. 4, which is more complete. We are, therefore, unable to determine how often the employers propose to have an audit made. We sum the matter up then to the effect that if it is desired that this bond shall be renewed, a complete and systematic audit of Mr. Graves' account must be made in a businesslike way, and the employers to fill out and send to us, through your office, the inclosed blank form of employer's statement, **F. 4.**"

The blank form of employer's statement F. 4 is the employer's statement of February 24, 1903, which is the subject of this litigation. It was inclosed in this letter. The Crowe Company then caused an examination and audit to be made of Graves' accounts, filled out and signed this employer's statement F. 4, and on February 25, 1903, Mastin's firm inclosed it in this letter and sent it to the Ætna Company:

"Please find enclosed employer's renewal certificates—Indemnity Bond—No. 1774—David C. Graves in favor of J. R. Crowe Coal & Mining Co. The above-named firm have had their books audited, and everything is found to be in perfect order. Trusting you will see fit to renew the bond, beg to remain, Yours very truly."

On March 2, 1903, the Ætna Company answered:

"We have your favor of the 25th inst. inclosing employer's statement in connection with bond F. 1,774 David C. Graves, in favor of the J. R. Crowe Coal & Mining Company, and in reply take pleasure in handing you renewal receipt renewing same to June 1, 1903, which we trust will be found satisfactory."

On March 5, 1903, Mastin's firm returned the renewal receipt, and wrote that they thought "the bond should be renewed from the date on which they finished auditing their books." To this letter the Ætna Company replied on March 9, 1903, that the renewal from June 1, 1902, covered past embezzlements during that time, if any, that many of those would not be covered by a renewal from February, 1903, and added:

"This feature is invariably lost sight of as a general rule, and if you will point this out to the J. R. Crowe Coal & Mining Company they will understand the situation and take the renewal up, continuing bond F. 1,774 without any break. Of course it is immaterial to us. We could issue a new bond from today covering Mr. Graves, but we would require to have some new papers. We return the renewal certificate herewith, and shall be glad to hear from you if this is satisfactory. If not, we shall be glad to issue a bond from this date if everything is in order."

Mastin's firm received the renewal receipt in this letter on March 12, 1903, delivered it to the Crowe Company, and the contract was closed. On June 30, 1903, the bond was again continued in force to June 1, 1904, subject to all the covenants and conditions thereof.

The court below was of the opinion that this evidence conclusively established the fact that the statement of February 24, 1903, was the inducement of, and became a part of, the contract of renewal of March 12, 1903, and that the June renewal continued this contract of indemnity. If the question were for the court, I should be unable to resist the same conclusion. It is true, as pointed out by the majority, that the statement contains references to a bond as:

"Amount of bond, $5,000; to date from February 1, 1903, to February 15, 1904."

"Employer's statement covering application made by David C. Graves of Kansas City, Mo. to the Ætna Indemnity Company, Hartford, Conn., for an indemnity bond."

"It is hereby agreed by the undersigned that the above answers are to be taken as conditions precedent to and as the basis of execution of said indemnity bond, and in consideration of the issuance of said indemnity bond by the company, it is further agreed that the checks and supervision above described shall be observed."

But these statements must be read in the light of the letters, of the acts of the parties, and of the testimony in this case, in order to rightly determine the question whether this statement was made and received to procure a new bond or to secure the renewal of the old one, and when this is done the evidence appears to me to be conclusive. The letters show that there was but one subject of this negotiation. None of them writes or treats of a new bond. Every one of them writes and treats of a renewal of the old bond. All the letters from Mastin's firm ask for the renewal or are written to procure it. All the letters of the Ætna Company prescribe the terms upon which it will renew the old bond. None of them prescribes any terms for the issuance of a new bond. None of them mentions a new bond, except the letter of March 9th, in which the renewal was finally returned, and that states that the issue of such a bond would require new papers. From August 26, 1902, until December 26, 1902, the Crowe Company was constantly seeking a renewal of the old bond, never a new bond. For

this purpose it had executed and sent to the Ætna Company two employer's renewal certificates. If one of those certificates had been accepted, and a renewal receipt had been issued upon it, would not that certificate have conditioned and become a part of the contract of indemnity? The Ætna Company rejected these certificates. The reason why the employer's statement of February 24th is in the form which has been recited and repeatedly refers to an indemnity bond is made plain by the Ætna Company's letter of December 26th. It there states that it requires this form of employer's statement because it did not originally secure this, the proper form of statement when the original bond was made. During all this time the Crowe Company had been seeking a renewal of the old bond. The Ætna Company had been prescribing the terms on which it would issue one, and in the letter of December 26, 1902, it gave its ultimatum. It rejected the second certificate. It sent the blank form of employer's statement here in issue and wrote:

"We sum the matter up, then, to the effect that if it is desired that this bond shall be renewed. a complete and systematic audit of Mr. Graves' account must be made in a businesslike way and the employers to fill out and send to us, through your office, the enclosed blank form of employer's statement, F. 4."

The Crowe Company caused the audit to be made, filled out the statement, signed it, and sent it to the Ætna Company in the letter of Mastin's firm, which recited its transmission, the fact that the audit had been made, and closed with the words, "Trusting you will see fit to renew the bond, beg to remain, Yours very truly." The Crowe Company had thus accepted and complied with the terms on which alone the Ætna Company had informed it that it would renew the bond, and the Ætna Company then immediately issued the renewal receipt, which after the letters of March 5th and March 9th the Crowe Company accepted without change. To my mind there is substantial and compelling evidence that the employer's statement of February 24th was the inducement and became a part of the contract of indemnity evidenced by this renewal receipt. The Ætna Company had made it the sine qua non of the renewal. The Crowe Company had furnished it. The Ætna Company had received it and had issued its renewal receipt upon it. This seems to me to make it the inducement of, and a part of, the contract of indemnity.

If, however, this be not so, there was certainly sufficient evidence here under the established rules of law to entitle the Ætna Company to a trial of this issue by the jury. Wherever the evidence upon a matter of fact is of such a character that reasonable men in the exercise of an impartial judgment may honestly reach opposite conclusions, the question is for the jury. Railway Co. v. Ives, 144 U. S. 408, 417 [1]; Chicago & N. W. Ry. Co. v. De Clow, 124 Fed. 142, 145, 61 C. C. A. 34, 37; Travelers' Ins. Co. v. Melick, 65 Fed. 178, 181, 12 C. C. A. 544, 547, 27 L. R. A. 629; Railway Co. v. Jarvi, 3 C. C. A. 433, 437, 438, 53 Fed. 65, 69; Fuel Co. v. Danielson, 6 C. C. A. 636, 57 Fed. 915; Railroad Co. v. Kelley's Adm'rs, 3 C. C. A. 589, 593, 53 Fed. 459, 463; Railway Co. v. Ellis, 4 C. C. A. 454, 456, 54 Fed. 481, 483. Two reasonable men, the majority of this court, are of the opinion

[1] 12 Sup. Ct. 679, 36 L. Ed. 485.

that this evidence fails to establish that the employer's statement became a part of the indemnity contract; one reasonable man, the trial judge, who saw the witnesses and noted all those matters not capable of record, whose opportunities to form a correct judgment were superior to those of any of the members of an appellate court, to whose deliberate opinion upon such a question the Supreme Court says that the appellate court should pay large respect (Patton v. Texas & Pac. R. Co., 179 U. S. 658, 660, 21 Sup. Ct. 275, 45 L. Ed. 361), was of the opinion not only that there was substantial, but also that there was conclusive, evidence that the statement became a part of the contract. The writer is of the opinion that the great preponderance of the evidence sustains this conclusion. Is it not then true that reasonable men may honestly differ upon the effect of this evidence, and that for that reason the question of fact is for the jury, and should be returned to them for trial?

Moreover, this issue of fact is one peculiarly within the province of the jury according to the established rule of decision. The question is what the effect of the 12 letters, the 2 renewal receipts, the employer's statement, and the 30 pages of oral testimony is, to determine the question whether the employer's statement is a part of the indemnity contract. In Rankin v. Fidelity Trust Co., 189 U. S. 242, 253, 23 Sup. Ct. 553, 557, 47 L. Ed. 792, the Supreme Court said:

"Although the construction of written instruments is one for the court, where the case turns upon the proper conclusions to be drawn from a series of letters, particularly of a commercial character, taken in connection with other facts and circumstances, it is one which is properly referred to a jury."

In Etting v. Bank, 11 Wheat. 59, 6 L. Ed. 419, Chief Justice Marshall said:

"Although it is the province of the court to construe written instruments, yet when the effect of such instruments depends, not merely on the construction and meaning of the instruments, but upon collateral facts in pais and extrinsic circumstances, the inferences of fact to be drawn from them are to be left to the jury."

And this rule is sustained by a flood of authority. McNamee v. Hunt, 87 Fed. 298, 301, 30 C. C. A. 653, 655; West v. Smith, 101 U. S. 263, 270, 25 L. Ed. 809; Brown v. McGran, 14 Pet. 477, 493, 10 L. Ed. 550; Goddard v. Foster, 17 Wall. 123, 142, 21 L. Ed. 589; Drakeley v. Gregg, 8 Wall. 242, 268, 19 L. Ed. 409; Barreda v. Silsbee, 21 How. 146, 167, 16 L. Ed. 86; Turner v. Yates, 16 How. 14, 23, 14 L. Ed. 824; Richardson v. City of Boston, 19 How. 263, 270, 15 L. Ed. 639; Nash v. Classon, 45 N. E. 276, 277, 163 Ill. 409; Roberts v. Bonaparte, 20 Atl. 918, 73 Md. 191, 10 L. R. A. 689; Eureka Fertilizer Co. v. Baltimore, etc., R. Co., 27 Atl. 1035, 1036, 78 Md. 179; Gassett v. Glazier, 43 N. E. 193, 195, 165 Mass. 473; 1 Thompson on Trials, §§ 1086, 1113, 1114; 4 Wigmore on Evidence, § 2556.

For the reasons which have now been stated, the errors relative to the breach of the covenants in the employer's statement were in my opinion prejudicial to the Ætna Company, this prejudice was not extracted by the errors in its favor, if any, relative to the admission and sufficiency of the evidence to establish the fact that the employer's

agreement was a part of the indemnity contract, and that company is entitled to a reversal of the judgment and a new trial of this issue.

There seems to me also to be error in the rulings of the court upon the question of notice.   The bond required that:

"The company shall be notified in writing, addressed to the company, at its office, in the city of Hartford, Conn., of any fraudulent or dishonest act on the part of the employee which may involve a loss for which the company is responsible hereunder, immediately after the occurrence of such act shall have come to the knowledge of the employer."

The first notice given to the Ætna Company was sent May 28, 1904, was received by the company on June 4, 1904, and it was that "we are having our books audited, and there appears to be every evidence that there will be a shortage in his [Graves'] accounts," and it gave no other or further notice.   The Crowe Company knew the fact which this notice stated just as well and just as conclusively on the 2d day of May, 1904, as it ever knew it.   Its agent and expert accountant who examined Graves' accounts and discovered his dishonest acts commenced to do so on April 22, 1904.   He caused the bankbook to be balanced, compared it with the cashbook and the outstanding checks, and discovered that there was a shortage in Graves' account of $212, and found unreceipted vouchers for the sum of $700 on that day and the day next succeeding.   On April 23, 1904, he called Graves' attention to the shortage of $212, and the latter admitted it.   He asked him to explain the irregular vouchers, and he tried, but was unable to do so.   Upon cross-examination this accountant testified that on April 23, 1904, there was a plain shortage of $212 on the face of the books, that Graves admitted it, and that he was then satisfied that Graves had embezzled $700 on the unreceipted vouchers.   On the afternoon of that day Graves voluntarily delivered his keys to his employer, left its service, and on May 1, 1904, he died.   This testimony is undisputed, and it seems to me to establish beyond doubt the fact that the Crowe Company had such knowledge of a dishonest act of Graves that might involve a loss for which the Ætna Company was responsible as early as May 2, 1904; that it was its duty to notify that company immediately thereafter; and that a notice on June 2, 1904, was too late.   The court was requested so to charge, and in my opinion its refusal was error.

When the evidence is undisputed, the question, what is an immediate notice is a question of law for the court, and a notice of 30 days after knowledge of a dishonest act is not an immediate notice.   National Surety Co. v. Long, 125 Fed. 887, 60 C. C. A. 623; U. S. Fidelity, etc., Co. v. Rice, 148 Fed. 206, 78 C. C. A. 164; Smith, etc., Mfg. Co. v. Travelers' Ins. Co., 171 Mass. 357, 50 N. E. 516; National Construction Co. v. Travelers' Ins. Co., 176 Mass. 121, 57 N. E. 350; Cook v. Ins. Co., 183 Mass. 50, 66 N. E. 597; Wiggins v. Burkham, 10 Wall. 129, 133, 19 L. Ed. 884; Toland v. Sprague, 12 Pet. 300, 325, 9 L. Ed. 1093.

The case of American Surety Co. v. Pauly, 170 U. S. 133, 18 Sup. Ct. 552, 42 L. Ed. 977, is distinguishable from that at bar, in that there was a conflict of evidence as to the time when the acts of dishonesty were first discovered while in this case there seems to me to be no

such conflict. In that case notice was given on May 23d. The court charged that, if the act of dishonesty was not discovered until the middle or latter part of May, the jury might find that the notice was given with reasonable promptness; but that, if the discovery was made on March 2d, they must find otherwise. Pages 146, 147, of 170 U. S., pages 557, 558, of 18 Sup. Ct. (42 L. Ed. 977). The Supreme Court was reviewing this charge and assumed that the act was first discovered the middle or last of May. The case of American Surety Co. v. Pauly, 170 U. S. 160, 18 Sup. Ct. 552, 42 L. Ed. 977, arose upon a similar conflict of evidence.

And, finally, if this question of notice were open for a finding by the jury, the court below erred when it charged them:

"Sometimes the suspicions might have arisen, and there might have been some facts that indicated, that the party was in arrears, and dishonestly so, and suspicions might exist that he was guilty of embezzlement; but subsequent developments might explain that away. So that the coal company, after suspicions had arisen, being prompt, had the right to pursue the inquiry to the end and find the true state of affairs, and then, if it gave notice to the indemnity company, notice within the meaning of this bond was immediately given."

The evidence in the case was that the Crowe Company had investigated from April until September, had discovered various defalcations which amounted to more than the penalty of the bond, but had never pursued the investigation to the end or discovered the true state of affairs, so that the effect of the charge was that no notice was required until the investigation ceased. In my opinion, this was a clear and plain error. The true rule is that the obligee in such a bond is required to give the notice immediately after he receives knowledge of such facts as would lead a man of reasonable prudence to believe that it was probable that the employé had committed an act of dishonesty or of fraud which might result in a loss by the obligor upon the bond. It is true that in other parts of the charge the court stated some general rules of law more nearly correct; but they failed to extract the vice of this specific and controlling charge, which was directed at the pith of the issue, to the effect that, if the Crowe Company gave notice after it had completed its investigation and had discovered the true state of affairs, that was an immediate notice, when the evidence was that it had discovered acts of dishonesty months before it ceased its investigation. The vice of a wrong rule in a charge of a court is not extracted by the fact that the right rule was also given, because it is impossible to tell by which the jury was governed, and the presumption is that error produces prejudice. Railway Co. v. Needham, 3 C. C. A. 129, 147, 52 Fed. 371, 377; Railroad Co. v. Farr, 6 C. C. A. 211, 216, 217, 56 Fed. 994, 1000; Armour & Co. v. Russell, 75 C. C. A. 416, 144 Fed. 614.